Petition for a Re-hearing.
[By Mr. F. Johnson.]
If the counsel for the appellee were not confidently impressed with the opinion, that the evidence in this cause, and the facts established, clearly and conclusively demonstrate, that the opinion delivered operates manifest and great injustice to the appellee, they should feel altogther unwilling to attempt to obtain a revision of an opinion couched in such strong and conclusive terms against the appellee. But, relying upon the force of facts brought to bear upon the mind of the Court, so clear and unquestioned in themselves, if they shall be able to present them in their full force to the Court, they are encouraged, with great deference to the Court, to call and respectfully ask attention, while they will endeavor to present that evidence, and point out some misapprehensions of the evidence, which seems to have led to the conclusions to which this honorable Court have arrived, which has formed the basis on which the decree against their client is founded.
They would respectfully suggest,—1st. that the rule is so well settled at this day, that it needs no argument or authority to demonstrate its justice and propriety—that when a defendant’s answer is discredited by evidence which clearly contradicts and falsifies it, in material and important points, or when the answer on its face is contradictory and falsifies itself, that the Court will wholly disregard it in other points of denial to the allegations of the bill, and also in matters set up in evidence or other, wise. We will be allowed, in the first place, to call the attention of the Court to the facts and evidence in the cause, which go to show that the answer of M. Ferguson, both the original and amended answers, are totally discredited. 1st.—it is alleged in the bill, that no settlement was ever made of the profits of the plank and lumber concern; that it was the duty of Graham and Ferguson to keep the account of sales, investments and expenses, &c. and that the profits were considerable, &c.
*564 To this, Ferguson denies it was their duty to keep accounts or books; that it was so understood by Robert Ormsby & Co. that he was to report all sales as made and every thing to them, and pay over the money as fast as received; and to induce a belief of the truth of these statements, he goes on to say that, as fast as he received or got $200 or $500, he paid it over, and never at any time had for one day $500 on hand, except at one time he had $600, which he took up the river, and paid away to creditors; (but what creditors, or to whom or what is not stated in either answer.)
The very nature and extent of the business in which they were embarked, made it their duty to keep accounts and books of sales and expenditures. Of this he was sensible, or he would not have alleged it was so understood by R. Ormsby & Co. It is proven expressly by Abraham Hite, Ormsby Hite, and William Fellows, who at the time were clerks of R. Ormsby & Co. that Ferguson never rendered any account of sales; that Ormsby & Co. kept no account except for advances, and payments and receipts of money, which were all regularly entered in a book, called a pass book, which Ferguson kept; and that it was the duty of Graham and Ferguson to keep books or accounts of sales, &c.—and the pretence of paying over as fast as he got from $200 to $500, and not having $500 on hand for any one day, except the $600, is disproved by Ferguson’s pass book, if produced, and in its absence, by the exhibit, A—see page 25 to 30—which A. is proved, and by which the following facts appear: In 1834, Nov. 6, he paid $759. 1st December, $600. In 1825, 28th January, $600. 19th February, $607. 22d of March, $1,880. On the 11th of June, $1294 56, 7th of July, $1032. 29th of July, $1788. 27th of August, $1100. 1st of October, 1550. 24th of October, $900. 24th of November, $1075. 22d December, $1500. In the year 1826, April 8th, $1978 66. 21st of April, $3300. 19th of May, $650. 9th of June, $1200. 25th of July, $1100. 2d of September, $1945. 12th of September, $700 and $1050. October 30, $1150. 20th of December, $1450. In the year 1827, 24th of January, $2000. 26th of February, $715. April 2, $900, 6th *565 pf April, $1000. 11th of August, $800. 10th of December, $1000. In the year 1828, 26th January, $1080. 27th of February, $750. What clearer and more ample .and satisfactory evidence could be required, to falsify the answer on that point? It may be asked what inducement there was to such a response. The purpose was to induce a belief that he really kept no books and accounts; and from his promptness in reporting sales and paying over, there should seem to be less necessity for the performance of his duty to keep accounts; and to avoid the effect of exhibit E. which represented that, on the 5th of August, 1828, he had on hand #4,800, or should have had it, the proceeds of lumber of 1826. He does not disclaim the credits thus given; his pass book, if they were erroneous, being in the hand write of Ormsby & Co’s, plerks, would detect any error in amount pr date, and the $600 too, paid away to creditors, is left unsaid to whom or for what; if for plank and lumber, it would increase the investment from $67,452 37, to $68,052 37, on which Ormsby & Co. would be entitled to share profits.
2d. In the bill, it is alleged he kept books and accounts, and he is called on to produce and exhibit them, that profits may be ascertained, &c. In his first answer, he denies he kept any books, except little memorandum books, in pencil marks, which had long since been destroyed as useless; pleads his incompetency, &c. To this part of the answer, exceptions were taken, heard and allowed, and he was directed to answer over, for it might be, he had procured these little pencil memorandum books to be transcribed, while his answer might be ‘ ‘adhering to the letter and violating the spirit.” In the second answer, as well as the first, it is evident that the attempt was made to gain implicit credit of his having kept no books; by the varied and oft repeated denial of having kept any other books than the little memorandum ones in pencil, which had been destroyed, alleging that they were sufficient between honest and confidential men, and he denies also emphatically, that these little memorandum books in pencil, were ever transcribed. See his first answer, page of record, 57, 58, 65, 66, 67. Second answer, pages of record, 82, 83. In the latter part of page 83, is to be found *566 the denial, that these memorandum books were transcribed into a look; latter part of page 84, it is repeated in another form; denial of books again, pages 87, 88. It was an all important matter to have the books forthcoming; his denial of there being any but small profits, could have been refuted by them; his claim to paper of 8th July, 1830, being a full, fair and final settlement of the profits, would never, it is presumed, have been made, could the books been had; and his equivocations and denials about exhibit E. would have been silenced, and the door would have been closed against the detailed conversations of Irvine, Graham and Young with Ormsby and Hite, about dissolution, and about final settlement, as we may rationally conclude, and the true time of dissolving the partnership, which is contested, would have thrown some light upon it, and the amount of sales would have given a certain guide to the actual profit; all these, however, was to be avoided by having kept no books.
Now, let us recur to the evidence on this book question. The first witness on this point is William H. Word, who lived with, and worked for, Ferguson. He states, “he does know that books were kept, in which an account of sales of lumber &c. was entered. M. Ferguson kept the books till Rice came with him; after that, Rice kept the books till Col. Young was employed. He has seen the books as kept by them both, and he has seen both writing in them.” See page of record, 196. Ferguson, by leave of the Court, re-took the deposition of Word, and in answer to Ferguson’s interrogatory, which reads as follows: “what kind of books did Ferguson, or Graham and Ferguson keep, or have in reference to the lumber business? Does Ferguson understand book keeping? state his skill, &c.” To which Word replied — “the books which deponent then (when he gave his former deposition,) and of which he was then speaking, when interrogated by complainant, were small memorandum books; one he, Ferguson, carried with him in his pocket, and in which he made his memorandum of sales, and the business he did during the day, and at night would write it off again in a large book with pen and ink,” &c. Page of record, 252.
William Colgan, page 226, states, that in Nov, 1826, *567 he was with Graham and Ferguson, and continued with them till some time in 1829, and boarded with Matthew Ferguson the whole time, and “M. Ferguson frequently brought home with him a book at night, and he has seen both Ferguson and Rice, who was then the salesman and cleric, examining the book and other books which seemed to pertain to the lumber business; and at the close of the years 1826, 1827 or 8, and perhaps all of these years, but he is certain of one, Ferguson and Rice were balancing their books and business of the year, and on that occasion they had several books; and he has seen Rice occasionally measure plank and other lumber, and sell it, and then go to this book and write, but cannot say whether there was a particular account of the sale kept or not.” And to the cross interrogatory of Ferguson as to Rice’s clerkship, page 229, he says—“he saw Rice in the office, saw him sell lumber and go to the book and write, and saw him and Ferguson examining them, and trying to balance them as before stated; deponent cannot say whether Rice was a book keeper or not, not being one himself; he never heard any complaint against him.”
James Harrison states, (page of record, 219, 220,) “from 1826 till 1830, he was in the habit of transacting business, and frequently settled accounts, with John Rice as clerk for Graham and Ferguson, for Overstreet and Harrison, and in those settlements, deponent was frequently at the office of the Lumber Yard, and he saw books, and he supposes the accounts of the concern were kept in them, and upon one occasion deponent thought there was an error in one of the accounts rendered, and so expressed himself to Rice, when Rice turned to the books, and satisfied deponent it was correct; this was in the year 1830. He further stated, he cannot say when Rice was taken into the concern, but he was acting as their cleric in 1826, and continued to act in that capacity for some year;" and Harrison attaches an account made out by Rice, commencing in 1826. See page 222.
John T. Gray, P. R. Gray, John S. Snead &c. prove facts and exhibit accounts all tending to show, that Graham and Ferguson, or Rice for them, kept books.
Robert Graham, the partner of Ferguson, in his an *568 swer (page of record, 89,) says, “no books were kept by Graham and Ferguson, other than a kind of blotter or loose memorandum, which he thinks he kept in the summer of 1823, when Ferguson was absent, and the other little books carried in the pocket, as described by Ferguson.” This book, he proceeds to describe, “was made of about a quire and a half of paper stitched together.” It was a short time only that Graham attended to the sales; only in Ferguson’s absence, as he says. James W. Graham, whose deposition was taken by Ferguson, to prove his ignorance; that he kept no books, &c. &c. It maybe observed that the evidence of this witness leans and bends towards Ferguson, so much so, that it deserves little credence when speaking in his behalf, and when against him may be taken full as strong as given. He says, (page of record, 257) in answer to 7th interrogatory put by Ferguson, among other things, that Ferguson “is not able to keep a memorandum book that any oilier person but himself can understand, and he had no persons to keep books any better qualified than himself till Rice came to the yard, which was in May, 1826,” (can he expect full credence even for that much?) But he proceeds, “all the books I ever knew Rice to keep, were memorandums; for instance; writing the individual’s name at the head of the page, with a Dr. on one side, and a Or. on the other; he would, on the debtor side; keep an account of dates, and the kind of lumber got,” &c.
The deposition of John D. Young, was taken by Ferguson, and, in his answer to the 6th interrogatory by Ferguson, he says “he dont consider Rice was a competent book keeper, by any means; and knew very little about accounts, and particularly, complicated ones. ” He felt quite satisfied he knew nothing of any system of book keeping. To the 7th interrogatory, which is as follows: “What kind of books did Ferguson, or Graham and Ferguson, keep or have reference to, in regard to the plank and lumber business? Does Ferguson understand book keeping? State his skill, &c. ” It should be remembered that this question is put by Ferguson; that the witness, from the character of the evidence, must have known what Ferguson’s answer in the cause contained, and the *569 object of the enquiry, and the desired answer. He was the successor of Rice as book-keeper, and if any one knew what sort of books Graham and Ferguson had, it would seem that this witness did know. Now mark the answer to this question—“He dont know what kind of books they kept: deponent was not then acquainted with them (Graham and Ferguson.”) “ Ferguson does not understand book-keeping now, and evidently never did, and evidently understands but little Of accounts. ” He can speak positively about Ferguson’s qualifications; he can say pointedly that Rice was not a systematic bookkeeper &c. But, he did not know Graham and Ferguson then, and dont know what kind of books they kept. And let it be remembered, Ferguson did not ask the question, as he swears that he kept no books—or rather to support his allegation of no books—not whether they, Graham and Ferguson, kept any books; but what kind of books; It is evident that Young, from his succession to Rice, must have seen the books which Rice kept; he does not describe, does not say there were, or there were not books, but evidently, avoids a direct response by, “dont know, he was not then acquainted with them.”
It is, therefore, as will be seen by the evidence quoted, most fully and incontestibly established by the positive evidence of three unimpeached and credible witnesses, whose situation enabled them to arrive at the certainty of what they detailed, that Ferguson did keep books; accounts are exhibited, and circumstances proven by divers others, going very conclusively to induce the opinion he must have kept books. His own witness J. W. Graham, proves the fact, as by his evidence recited, and his other witness, Young, by avoiding and getting round the question, as good as proves it. How shall Ferguson, therefore, escape ? He sets up, to avoid rendering an account, when called on in the bill, to do so, that he has kept no books; he has not proven it by any witness, though he attempted to do so by Graham and Young, who proved him to be as ignorant as he could desire, as to accounts, but so cute in other matters as to buy a horse, poor, at five dollars, and soon sell him for one hundred and fifty dollars. But yet, they dont venture to prove, he kept no books. He *570 has failed to prove his excuse for not producing his books, and the appellee has established beyond'all controversy, that the excuse, set up, is wholly and deliberately false, and unfounded, by three witnesses, positively, and by others, as stated. And this is not a light point in the cause; for if the books were produced—and we are. justified upon well settled principles to say, that when a party withholds a paper or books, they would, if produced, make against him — and we may fairly and according to well settled doctrine, on this point, presume and charge, if the books thus proved to exist, was produced, we should be able to show, most conclusively, that there were thousands of dollars due and uncollected, on the 8th of July, 1830, beside the $3115 30, set apart for Ormsby & Co. to prove by the books, that exhibit E—of which the witness, Young, could make neither head nor tail, an ¿"which, Mr. Ferguson could not, as he says in his answer, at all comprehend, (a plain paper too,)—was an account they would show to be true by the books, and would have cast much light (though the books may not have been kept systematically;.) and have enabled the plaintiff in the Court below, to ascertain his rights, better than without them; they would throw some light upon the contested point, when the partnership ceased; and these books, if produced, we have the right to presume and infer, would silence the contest and testimony about the settlements of 1830, and 1832. It does seem, no one can doubt, from the evidence connected with the answer, that Ferguson stands discredited as to having no hooks.
Ferguson, in his answer, pages of record, 65, 83, 86, 87, denies in various forms, that Rice was his clerk, or kept books for him.
Now it is proven, positively, by Harrison, Word, Colgan, D. Smith, John T. Gray, P. R. Gray and others, that Rice was, and did act as his clerk, and did keep books. This was also an important fact. To have kept a clerk and book keeper, and to have kept no books would not do so well. It was necessary to get rid of the clerk, as well as the books. His having a clerk, and keeping books, falsifies his answer of having kept no books, as well as having no clerk. He had, as he supposed, suffi *571 ciently proved his own ignorance, and he gets the same witnesses to try how ignorant they can make Rice. But Rice is sustained, (not as a systematic book keeper it is true,) but in the fact that he did keep the books, make out long accounts, and collect money, and was the credited agent and clerk of Graham and Ferguson. And it seems it was estimated essential also, to get rid of Rice as clerk, to give color of plausibility to the denial of exhibit E.
But the answer must stand totally discredited in this important point also, and must be held, that Ferguson well knew that Rice was his clerk, and kept his books, and therefore, there is no excuse for his equivocations and denials on this point; and his denial must be held to have been made knowingly, in contrast with the facts.
The exhibit, No. 1, which he files and swears is in the hand write of Robert Ormsby, and was furnished by him, is disproved by three witnesses, A. Hite, O. Hite and W. Fellows: see their depositions and answers to 20th interrogatory. They prove Ormsby did not write it, in the most positive manner.
It is charged in the bill—page of record 17—that neither Graham nor Ferguson, had rendered any account of sales, expenses or profits; had refused to exhibit their books, or give complainant any satisfaction, or settle with him the concerns of the plank and lumber account.
To which he answers, a settlement was made, 8th July, 1830. That they never kept any regular set of books; see page of record, 66; and denies he ever refused to de liver any books or papers under his control, and in fact a full and clear statement has been made.
Robert A. Woolford proves (page of record 240,) that Ferguson and Hite conversed about exhibit E. That Hite came to Louisville to get a settlement, and had to go away without. A. Hite proves that Thomas Hite was in Louisville in 1830-31, to get a settlement. Ormsby Hite proves the same, see pages 202 and 207. W. Fellows proves the same, page 215. Here are four witnesses in addition to the admission of Young, in his 2nd deposition, who proves Hite sought a settlement, and Ferguson would not. This last, perhaps, is not a denial of much *572 consequence, as it only involves that fact itself. But there are other denials and statements in the answers, clearly disproved. But those cited, and shown by the evidence to be disproved, is enough to discredit the answer in toto, and to justify the Court in proceeding in the case as ihqugh.no answer had been filed, for its veracity is destroyed, and it cannot be, that men shall be allowed to hide, put out of the way, or destroy partnership books, and substitute their answers and denials of books, to pvade obedience to justice, to escape with all the profits, conceal all the transactions, and be held justified or excused; allow him full credit when discredited, and turn off his co-partners without any thing more than such an one shall be pleased to render, it would set a precious example. It is admitted the proof should be clear and conclusive, and we respectfully contend that, in this case it is so conclusive as to admit of no doubt. Considering his answers as falsified, we shall proceed to consider other points.
As to the continuance of the partnership, it is alleged in the bill, to have had no limit as to time. The answers admit it was not limited. Hence, it follows, that the party who alleges-a dissolution, is bound to establish the fact of the dissolution, by at least satisfactory evidence. The Chancellor, as well as this Court, has concluded it was ended in 1826, or winter of 1827. The reason alleged and proved, is that it was found to be an unprofitable business, and the evidence of dissolution is confined pretty much in the declaration of Robert Ormsby, since deceased, stated to have been made at subsequent periods. Ferguson, who is most and alone interested in establishing a dissolution, is not able to fix on the time, nor the manner, nor by whom dissolved; be ranges from 26 to 27. It is proved by A. Hite, that Ferguson, at the end of 1823, was anxious to go larger into the business, exhibiting a clear profit of $3000—about 50 per cent upon the amount laid out. Smith, says the profit in 1823, 4, 5, and 6, must have been greater than after, because, then, there was less competition; and he estimates, being himself engaged in the business, the profits upon investments, at from 30 to 40 per cent, nett, and the profits made, *573 and expected to be made, must have been the motive for trebling the purchases in 1826. Ormsby & Co. says Ferguson purchased more lumber in 1826, than they had purchased in the whole of the preceding 3 years ; that square No. 2 (6 acres) would not hold it all; and that, of the timber and plank, a large part was put on a lot of Graham and Ferguson, near the Episcopal church, (page of record 58.) And in page 60, Ferguson, while trying to excuse himself from payment of rent, for the subsequent years of 1827, 28, and 29, says: “It (square No. 2) was occupied by joint lumber in 1827, and he believes, in 1828.” (But his witness, Irvine, swears he piled 1,400,000 feet of lumber, on square No. 2, in 1827. Which of the two is correct? if either is true.) We, therefore, conclude, if it, the partnership, was dissolved in 1826, or winter of 1827, the wrong reason is assigned. What! immediately after investing about $35,000, dissolve partnership, and leave all in the hands of men who kept no books, and was buying and mixing their own lumber with it, and no clerk! nor accountant, or other person to manage and keep accounts? And Ferguson, in another part of his answer, says that the lumber purchased in 1826, lasted 2 or 3 years; the strangest sort of management it was, if true, for prudent men; and the evidence of dissolution is confined to the conversations of Robert Ormsby, subsequently had, and one with Hite, casual, as late as 1834; the weakest and most suspicious sort of evidence to establish an important fact against circumstances to the contrary.
It is not pretended in the bill, that advances were made after 1827. But is alleged that, the profits had been so considerable &c. that Ferguson and Graham were enabled to carry on the business without further advances. Ferguson, in his first, denies he was bound to let Ormsby & Co. share the profits, after they, Ferguson and Graham, were able to go on without advances; and admits, and the evidence proves, that Graham and Ferguson did retain until after January 1828, a large amount of the advances of Ormsby & Co. which they employed, or might have employed, in purchases of 1827 and 1828; and we think that, the partnership must continue until the appel *574 lant shows its dissolution: that the proof on this point lies on him. Whatever end may be fixed to the partnership, it cannot, in effect, be fixed at an earlier period than that fixed by the Chancellor. The Chancellor confined the interest of Hite and Ormsby to the purchases made up to and including 1826; but continued the partnership, in effect, until 8th July, 1830. If this Court adhere to the fall of 1826, or winter of 1827, and believe Irvine piled the 1,400,000 feet of lumber sold to Graham and Ferguson, in Spring of 1827, on square No. 2 — then Hite is unquestionably entitled to some compensation, as rent for the use of this property, from that time till January, 1832.
II. It is respectfully suggested that, this Honorable Court has mistaken . the principles on which the Chancellor’s decree in this case is based as to the profits.
The decree does not consider that $67,452 37, was actually advanced and invested in the 4 years, without any returns from sales; but that the $67,452 37, was invested in plank, lumber, shingles &e. as per account A, to be sold and vended by Graham and Ferguson. There were investments and receipts each year, as is proven by exhibit A, and that during that period, that advancements and investments were made to that amount, (or near: I will not exactly say the precise amount, because I had not examined every voucher,) or in the neighborhood of it, is unquestionably true, as shown by that account, and established by the evidence, and not denied by the answer, if its denial could be considered as of any avail; and assuredly Ormsby & Co. are entitled to share the profits on all the purchases and investments, whether actual advances, or re-investments of the proceeds of sales.—And by reference to the vouchers filed, of purchases of 1826, and payments of that year, and in the year 1827, it will be found, that in the year of 1826 alone, between $32,000 and $35,000, of lumber and plank, &c. was purchased for the lumber business, and placed under Graham and Ferguson to sell and vend; that the payments of and in 1826 amount to about $45,000: about $10,000 of it for previous purchases in 1825, page 165. Duncan, Forsyth and Riddle’s account, &c.
*575 That one bill of lumber alone, of 19th April, 1826, (see page 163, 164,) amounted to $13,295 37, on which $5,395 37, was paid in cash, and notes executed by R. Ormsby & Co. for the remaining balance of $7,900 at short dates, so that the amount invested in 1826 alone, was about $35,000; about as much as in all the three preceding years, and more than twice the amount Ferguson says he got of Irvine in 1827, which was $15,000 worth; so that the profits on the purchase and investments of 1826 alone, estimated at 35 per cent, the medium fixed by the Chancellor’s decree, would be about $12,250.
This estimate is no chimera, or fanciful or imaginary thing; for it is known that, in these years.no business yielded so great and so certain a profit, as the plank and lumber business, and such it is fully proven in this case to have been. We think as Ferguson obstinately and fraudulently withheld his books, and would render no account of sales, that the decree should have fixed the highest profit, otherwise it will encourage frauds of the kind; and moreover, the presumption of greater profits arises from the withholding the books; if the books would show less, they would be produced; and there is another fact well proven, that deserves some weight in considering the profits, when no accounts of sales are rendered, and that is, that Ferguson had labored in his vocation of carpenter six years in Louisville, without accumulating any thing; and in the plank and lumber business, without books being kept, he becomes rich, so he cannot plead poverty in the business as well as ignorance. All the facts in proof, and circumstances in the cause, do clearly demonstrate that great profits were made on the investments; that R. Ormsby & Co. have not been refunded their advances and responsibilities with legal interest, and that Ferguson, by the no book story, has managed, as yet, to hold on to all the profits of any consequence, and to build on them and with them, a considerable estate, not less than, as is proved, $100,000, and had not a dollar to begin with. There being no books or accounts of sales to be had, we are driven to estimate the profits by comparison, and by the usual profits at the time, and in that vve *576 fall below the mark; fox it is generally true in all business, the larger the purchases and the prompter the payments, the cheaper the article is purchased, and the greater the profit, if sold at customary prices. And in this case, Ormsby & Co. purchased, and possessed the means of purchasing, to the extent of any others in that day. The amount laid out in lumber &c. during that four years, and vended by Graham & Ferguson, sold sooner or later, gives the basis on which to estimate profits, (there is no wear and tear in piled and put away lumber, nor decrease in value, but the better seasoned the better price,) and the testimony of the usual profits gives the criterion by which to estimate the profits so that it will be found, with all due deference to the opinion expressed by the Court, that the basis and principles which has led them to the conclusion, that $5000 was about a fair profit for the investment in the four years—in the first year, 1823, when not exceeding about four or five thousand dollars was invested, it is proved by A. Hite, that Ferguson represented, as Ormsby said, the clear profit was $3,000, about or more than fifty per cent. Smith and Irvine who were engaged in the like business, proves the profit not less than from 30 to 40 per cent, and if, in fixing the amount invested in the four years at only $65,000, we shall have a profit exceeding $20,000; and if the investment be what we suppose it to be, without scrutinizing the bills and account A., the result will be about what the Chancellor has fixed on. But on that he has allowed no interest, and it inevitably results from this state of the case, or any others based on the profits on the amount of sales and investments, that it, at once, is conclusive, that the paper of 8th July, 1830, is what we contend it to be, and nothing more, and uproots the testimony as to the conversations and confessions of Ormsby and Hite, without the aid of the other testimony and facts in the case, and must bear on another conclusion, which the Court has suggested, that “the facts in the record prove conclusively, in our opinion, that the partnership concern was finally and irrevocably settled by the parties themselves.” The Court proceeds to say that “on the 8th July, 1830, they made a settlement, in which Ferguson was *577 charged with the balance on R. Ormsby and Co’s. ledger for $8,670 14, and were allowed a credit for $10,416-76 for payments made after 2d January, 1828, on account of sales of lumber bought in 1826,” With due deference it is suggested, that it does not appear in the account nor in the proof, that this #10,416 76 was paid out of sales of the lumber purchased in 1826. “And also for #3116 31, for uncollected notes and accounts, for lumber of that year’s purchases, sold since the 5th of August, 1827.” It no where appears that these notes and accounts were for lumber sold since 5th August, 1827, as supposed. When and of whatyear’s lumber, the #1000 due at Natchez, which is one of the items, was of, is not stated; and the $717 charged as Matthew Ferguson’s ac, count up to 5th August, 1828, it is but fair to presume, may a part of it originated in 1823 or 1826, and these two items constitute more than half the $3115 31.
The paper of the 8th July, 1830, alluded to in the opinion, as mutually signed by the parties, reciting that it was a memorandum of a “settlement of their plank and, lumber account,” reads as follows, as appears by the record, on pages 96, 97.
“Memorandum of a settlement of accounts, this day, between Graham and Ferguson, and R. Ormsby and Co., all of the city of Louisville, of the plank and lumber account, viz:—
Graham and Ferguson to R. Ormsby and Co., Dr. 1828, Jan. 2. To this amount due on plank
and lumber, per balance struck on their ledger, on this date, $8670 14
Same, Cr.
1830, July 8. By sundry credits on books of
Hite, Fellows and Hite, up to this date, as appears on their ledger, $10,416 76 .
By amount of sundry debts due by individuals to plank and lumber account, in the hands of Graham and Ferguson to collect, and when collected to be accounted for to R. Ormsby and Co., viz—
Robert Graham, due bill for $482 50
Baptist Church account for 288 25
Peter Daniel “ for .60 00
*578 John T, Gray “ for 342 98
Honoré & Phelps “ for 26 10
John Weaver “ for 75 37
Old Meeks “ for 20 00
F. W. S. Grayson “ for 108 25
Moses Graham “ for 45 36
Natchez, Anthony Richardson supposed for 1000 00.
Matthew Ferguson, up to 5th Aug. 1828, for 717 00
$3115 31
“It is understood by the above mentioned Graham and Ferguson, and Robert Ormsby and Co., that they, the said Graham and Ferguson, shall be entitled to one third part of the nett profits arising from the above business, and Robert Ormsby and Co. shall be entitled to the other two thirds as soon as the profits shall have been understood in conformity to this settlement. Witness our hands, July 8, 1830. Robert Ormsby & Co.
Graham Ferguson.”
From which it will be seen that the recital of this agreement, by the Court, as a “settlement of their plank and lumber account,” signed by the parties, is a variation from the paper itself. The paper says, a " momorandum of settlement of accounts this day,” between them, “of the plank and lumber account, viz then it specifies with exactness and precision, what was settled, excluding all inferences and presumptions, beyond its specifications; so that there can be no mistake or misapprehension of what was settled, if we shall be governed by the paper itself; was it the profits or loss of plank and lumber accounts? Not one word is said about the profits, no charge or credit for profits, and the only mention of profits in the whole paper, is in the concluding sentence of the under agreement, declaring how and in what proportion the profits should be divided, when understood, which negatives the idea of profits being included and settled, and totally precludes such a conclusion or inference. . But it is simply an acknowledgment of how the accounts and balances stood in the ledger of R. Ormsby & Co., and Hite, Fellows and Hite, on the former, showing the outlay exceeded the receipts up to 2d January,
*579 1828, $8670 14. The latter, that the receipts exceeded the outlays from 2d January, 1828, to 8th July, 1830, $10,416 70. 2dly, that $3115 31 was designated and set apart, of debts which Graham and Ferguson were to collect and account for to R. Ormsby & Co., without saying or giving any information for what those debts had been contracted, and among which is found M. Ferguson’s account up to 5th August, 1828, for $717, which implies there was an account of M. Ferguson since that period, and is so marked to prevent the conclusion that his account was settled up to that day. For what this account was contracted the paper itself does not show. And then as regards “profits” The first word said about “profits ” and the only thing, is to declare and agree how they shall be divided. One third to Graham and Ferguson, and two thirds to R. Ormsby & Co., arising, (not which has arisen) from the above business, as soon as the profits shall be understood or ascertained in conformity to this settlement. How in conformity to this settlement? It is distinctly settled, first, that the disbursments and receipts by Robert Ormsby & Co. on then-books, and the books of Hite, Fellows and Hite, was so much, as stated. 2d. It is settled and agreed that debts to the amount, (all specified,) of $3115 31, then ’ in the hands of Graham and Ferguson are to be collected by them, and accounted for to R. Ormsby & Co., and, thirdly, it was settled that Graham and Ferguson was to have one third, and R. Ormsby & Co. two thirds of the nett profits arising from the above business, when ascertained or understood. Is there any recognition or pretence that an account of profits was rendered, or books or balance sheet presented, by Graham and Ferguson ? None. If there had been, is it not certain, had it been satisfactory, it would have been recognized in that settlement, or in some way alluded to? But there is not a word of account of sales or profits rendered; and such an inference is precluded by the minute detail of exactly what was settled. And it should be noticed that Mathew Ferguson’s account included in the $3,115 31, of $717, is marked, up to 5th August, 1828; not up to the day of that settlement. Ferguson, in his answer, in allusion to *580 exhibit E (see page of record 85,) admits there may have been on hand on 5th August, 1828, $2000 of the lumber of 1826. He admits dealings with many of the debtors specified in that paper, he knows the firm had dealings with some of them. But most positively denies that the $9,201 56¼, was justly chargeable to Graham and Ferguson, and dashes off in the. old style of no books. And if money was collected from any of those persons, it was paid over as fast as received. And with this sort of allegation, Mr. Ferguson settles all difficulties and demands, as fast as presented. This is the allegation which he administers to all demands, and with which he attempts to relieve himself of all difficulties. It is not pretended that Graham and Ferguson was justly chargeable with the $9,201 561, but it is contended that, they should account to the concern, for these accounts and lumber &c. The. answer is not only evasive, therefore, but seeks to skulk from responsibility by denying that Rice was clerk, by ignorance of the paper and its contents, and lastly, if these will not answer, then, that if any thing was collected, it was paid over as fast as received. And it will be seen, that the debts due the concern in paper E, and the paper of the 8th July, 1830, are in no instances the same.
Gray’s note, bears date, or was due 16th July, 3828; it is not included in E; but in E, is an account of $50, against him, which shows that the one was a memorandum of debts, set apart to be collected, and paid over to Ormsby & Co. and the others, in E, remained still as a fund of the common concern. He has denied rendering any other account, than that, of 8th July, 1830, and in that not an item of profits is mentioned; and it is going too far to presume, that in so extensive and profitable a business, where the proportions of divisions of profits are stipulated—that all account of profits should be dispensed with. It is true, in his answer, he swears, it was a full, fair and final settlement. Even his own account, from 5th August, 1828, to 8th July, 1830, is expressly left unsettled; the paper itself precludes the idea and conclusion of its being a full and final settlement j and what can his answer weigh against the writing, which it does not impeach—even if it wag pot totally discredited in so many important-points, *581 not only by positive evidence, by its own allegations, equivocations and assertions—against facts and circumstances in proof.
As to the building contract of 28th September, 1830, it is respectfully believed it can have no sort of bearing to prove or disprove the contents and purposes of the paper of 8th of July, 1830, to have been a full and final settlement of the profits of the plank and lumber account, Nor can all the parol evidence add to it, or take from it, It contains nothing that is ambiguous : it is certain and specific, and speaks for itself; but it may be justly remarked, that the paper of 8th July, 1830, was not before the parties on the 30th September, when the building contract was made and executed; because it is mis-recited, and stated to have been made in June, instead of July; 2nd. because the amount to be accounted for to Ormsby & Co. set apart in the paper of July, is left blank, neither the date of the paper of 8th July, nor the amount to be paid over as therein agreed and settled on, was recollected; the one was misquoted, the other left in blank. It is fair and reasonable to presume, if that paper had been present on 28th September, that the correct date of it would have been inserted, and the sum of $3,115 31, would have filled the blank. The words in this point of the contract for building, (see page of record 99,) are—“Ferguson and Graham agree to receive in part of the building materials to be furnished, the balance of plank and lumber account, as has been settled by them, and the parties of the second part, in June last, amounting to $— and for &c.” Now can there be any doubt but this blank would have been filled up with $3115 31, if that paper had been before them ? It was settled by the paper of 8th July, which is the paper alluded to as of June, that Graham and Ferguson should collect certain demands, and account for them to R. Ormsby & Co. amounting to $3,115 31, and that paper shows, that was all that was set-tied to be paid to R. Ormsby & Co, and that amount was settled definitely, to be accounted for to R. Ormsby & Co. and that paper negatives, as before shown, by its own terms, that this had been a settlement of the profits; the outlays and receipts by that, showed that Ormsby & Co. *582 had received more than they had paid; in addition to that, the $3,115 31, is set apart for them, and the profits arising from the above business, without saying the business was ended — was to be divided, when ascertained; and the building contract, it is obvious, would not, and did not, refer to the paper of 8th July, but for the single purpose of describing the amount which G. and Ferguson were to receive towards the buildings, and not being present, and the sum not recollected, it is described as the balance settled on, in, and by that paper, amounting to $—Ormsby and Hite contended for a credit for the whole $3115 31, and the balance to be paid in rents as agreed. But the clerk of Ferguson credits two thirds of the amount on his own account, and swears that Ormsby agreed to it, and so entered it in his account. Ormsby did not enter it. Young wrote, and he, without the assent or knowledge of Ormsby and Hite, wrote also, on the margin of the paper of 8th July; opposite the items forming the $3115 31—settled, as he states; and which Ormsby, or Hite, as soon as discoverered, crossed out, leaving it legible, to manifest their negative to Young’s officious acts. They crossed the credits, too, for the $2076 88, as rejected by them. What more could they do to reject the proffered credit ? But it is admitted, Young and Graham proves, it was done, the credit entered by Ormsby’s direction, and that the balance of $5097 52, was admitted to be correct; and as to the credit to be given to their testimony, it is for the Court to decide, from all the facts and circumstances in the cause. Some of them have, and others will be noticed herein, on that point.
The paper of the 8th July, declares the $3,115 31, is to be accounted for to R. Ormsby & Co. not to the concern of Graham and Ferguson and Ormsby & Co. not as a part of the profits to be thereafter divided, but an admitted amount to be accounted for to R. Ormsby & Co.; there being no doubt then entertained by any of the parties, that the profits, when ascertained, would exceed the balance of the accounts of Ormsby & Co. and Hite, Fellows and Hite, for outlays and receipts, and also the $3115 31. If there had, it was surely competent for the *583 parties so to express themselves. But by that paper, they excluded such a conclusion as that; there was no other profits, other than the $3115 31, to he ascertained, when the solvency of the debts were tested.
And here it may be remarked, that Ferguson is called on by the bill, to state and exhibit an account of the lumber sent to Natchez. He answers he does not know. Is it possible a man so keen as Graham, the witness, makes him to be, should have shipped lumber to Natchez, and keep no account, and not know how much he had sent? Impossible! And the sale of lumber at Natchez is left open in the paper of 8th July, for future adjustment; it is marked, supposed to be $1000. Does not that leave it open for future adjustment? Has the amount been ascertained? It doubtless has by Ferguson; but he has never communicated it to Hite or Ormsby. He may have received $2000 or $3000. A boat load of plank was worth that, That is all the certainty afforded, of the amount of the shipment; and for there being but a boat load, we have only the answer of Ferguson.
Ferguson and Graham had bought horses and drays of Hite and Ormsby, and given their notes, which, with interest amounted to $343 75, as specified in account and page of record 34; which they argued should be credited on building account, at request of Ferguson; and also a credit for $800, for rent then due. All this was in strict obedience to the building contract. But the parties had stipulated—one to give, and the other to receive, only the $3115 31 of the plank and lumber business. Even Ferguson’s private account with the concern, after 5th August, 1828, up to the 8th July, 1830, was excluded. And why is left unsaid, only because the parties had stipulated the special and particular manner in which the buildings should be erected and paid for; and the plank and lumber account remained unsettled; and Ormsby and Hite, though it may have operated against their interest, adhered to the very letter and spirit of their contract, until Hite found he could obtain no settlement of the profits; refused to let the rents go to Ferguson, until he would settle; refused to allow him credit for purchase of lots, or rather to take credit on the building account for *584 lots purchased by Ferguson, to force him to a settlement; and Ferguson then determined on his course, to refuse, sue and deny all manner of accounts and books being kept by him. Ormsby was dead; Rice, the clerk, was dead; and the way was clear, to enter on the field of denial, and asseveration of no books, as he supposed.
And it would seem that the Court was led to the conclusion, that about five thousand dollars was a reasonably fair profits under the idea that not more than $ 10,000 had been advanced by Ormsby and Co,, not considering that they were entitled to share profits in re-investments, as well as the original investment; and they suppose this is one inducement to the conclusion to which the Court arrived, in believing “that a settlement, full and final, of the lumber partnership accounts, including advances, receipts and profits, was had by the paper of 8th July, leaving the profits unascertained, only as to the uncollected balance of $3115 31, the parties not being able to ascertain how much of that would be available.” And we think the evidence herein shows, and the facts will show, that such a conclusion should not be entertained, as not warranted by the facts in the cause; and it is respectfully submitted whether any oral evidence, such as is introduced to prove a final settlement, should be allowed to prevail over the specific terms and language of the paper of 8th July; or what has been sworn as passed at the settlement of the building account, should be allowed to convert that paper, against its own unambiguous language, into a full and final settlement of the profits of the plank and lumber business, and thereby deprive Ormsby and Co. of all participation in the profits—shown to exceed, beyond all doubt, largely upwards of $20,000, if not $24,-000, and perhaps 330,000—and cut them off with a participation in some four or five thousand dollars only; not, it is believed, the legal interest on their advances before returns were made, if a nice calculation was made; for the receipts of no one year equalled the outlays, as will be seen by account A.
The Court presumes, that had Ormsby have lived, that this controversy would not have happened; upon what that presumption is founded, with due deference to the Court *585 is not perceived. If it be supposed Ferguson would more readily have settled with Ormsby than with Hite, that can avail nothing, now he is dead, or relieve Ferguson from any duty or obligation to the firm. If the presumption has been induced from the testimony of Graham and Irvine, who prove the good character of Ferguson, of rather Ormsby’s exalted opinion in his honesty and integrity, &c. the counsel of Hite, surviving partner, was not apprised, that the good of bad character of Ferguson, could be brought in issue, except so far as he jeoparded it by his answer, and proofs contradictory to that answer, or that Ormsby’s opinion of Ferguson’s honesty &c. would be esteemed the legitimate subject of proof, and could be brought to bear in favor of raising presumptions against Hite and Ormsby’s just demands; or Hite could have abundantly shown the true estimation in which Ormsby held Ferguson long before his death, and would have shown it, if it had been proper and admissible; and he could have supposed it to have any bearing.
The Court seem to think that exhibit E. was made by Rice, for Robert Ormsby, before the settlement of 8th July, 1830, and that it contained only Rice’s opinion of what had been sold, &c. By adverting to the evidence of R. H. Wolford, it will be seen that Ferguson himself had conversed with Hite about that paper, (though he denies all knowledge of it, and cannot comprehend it.) That it could not have been made out previous to 7th July, 1830, is evident, because the last item in the account is of that date (the day before the 8th of July,) and how could Rice make out such an account, containing specific dates to each item, unless there had been books to make it from. It ran from 5th August, 1828, up to 7th July, 1830, and all the credits to Graham and Ferguson, representing plank and lumber accounts amounting to $6648-80, are specifically entered in account A., and it is admitted, on all hands, exhibit E. was in Ormsby’s possession on the 8th of July, at the settlement; Ferguson must have seen it there — how else could he state in his answer, it was there, and “pencil marks made on it by Ormsby.” It is true, nevertheless, that in another part of his answer, we admit, he denies all knowledge of it *586 These facts taken together—that paper E. was before them on the 8th July, 1830; that such of the credits on it, which had not been entered on the books of Hite, Fellows and Hite, were, as it appears from exhibit A., entered on that day; the same accounts amounting to $3115 31, which were set apart to be collected and paid over to Hite and Ormsby, are also written in it; the setting apart the $3115 31, as mentioned; the settling of M. Ferguson’s account up to the 5th of August, 1828, the very day the exhibit E. commences its date, showing that Graham and Ferguson had, or ought to have had, $4,800 of cash on hand, of lumber of 1826, and the $2,000 worth of lumber, and the other demands mentioned therein—seem incontestibly to prove, and full evidence, that the debtor side of that account was left for future settlement and investigation, and comparison with the books of Graham and Ferguson. What else could have induced or prevented the settlement of Ferguson’s account up to the 5th of August, 1828, only, if there was not something else to account for. Exhibit E. was present; the credits of $6,64880 were entered on Hite, Fellows and Hite’s books, and no entry made of the debtor side, and the settlement of Ferguson’s account stopped where that account began. From this view of the subject, exhibit E. will be found to have much to do with the case, affording an important key to unlock the mysteries in which Ferguson, by his denial of books and clerks, has endeavored to cast over the transactions, as vender of the lumber, to avoid accountability. He knows his own account remained unsettled after 5th August, ’28. It proves he saw the paper on 8th July; it proves Rice must have been clerk, and that he must have had books; it proves the settlement was partial only; it is in many points of view important.
The Court seem to think that, after the settlement of the building account, that Ormsby and Hite remained satisfied, and put up no further claim on account of plank and lumber. This conclusion, we apprehend, is not warranted from the evidence or facts of the case. By looking at the building contract, it will be found specific as to the materials and buildings, and special as to the payments, *587 securing to each party a specific mode of payment and receipt; the $3115 31, as we contend, Ferguson was to receive, and he was to await the receipt of the balance by accruing rents; which was attempted to be strictly adhered to on the part of Ormsby and Hite, until the difficulty arose about the $3115 31, and Ferguson, after that, was allowed the receipt of rents, in pursuance of the contract, until he had procrastinated the final settlement of plank and lumber account to a most unreasonable length; so that Hite was induced to believe he was disposed to avoid a settlement; then the rents were stopped, and Ferguson’s purchases refused to be applied to the balance on the building accounts. It is in proof by A. Hite, Ormsby Hite, W. Fellows and Robert H. Wolford, that Hite often pressed a settlement of the plank and lumber account without effect, and that he continued to do so as late as the spring of 1836, for near four years after the building account, in June, 1832; and during this time, Ferguson was receiving rents and withholding the proceeds of plank and lumber.
Young, in his first deposition, said nothing upon this subject, but proved every thing necessary or needful, full up, as was supposed, to the success of Ferguson, who, it would seem, from his own account of the matter, entered credits and made settlement of 1832, without consulting Ferguson. To show that Young had omitted some things, and misrepresented his errand to Hite, Robert H. Wolford’s deposition was taken, on 1st December 1838. He states, “he saw Hite and Ferguson with exhibit E. in Ormsby, Hite & Co’s. counting room, and they conversed about it.” He states “that some two or two and a half “years before (giving his deposition) the witness, Young, “ came to the counting room of Ormsby Hite & Co., some “two or three times or more, and said he came for the-“purpose of settling and adjusting plank and lumber ac“counts with Hite and Ormsby. At one of the times, “Hite exhibited to Young exhibit E., and also the Jour“nal and Ledger, wherein is entered the account of plank “and lumber, were laid upon the table. The witness, “Young, examined them for an hour or more, took notes “or extracts from the books, and remarked as to the ac *588 count E., shown him by Hite, and which he had exam“ined attentively, that he could not tell how Mr. Rice had “ made that account out, for he had looked over and ex“amined, and could not make head nor tail of them.” (he said nothing, it should be remembered, about Ferguson’s books of accounts, when interrogated by Ferguson, as to the sort of books kept by Graham and Ferguson, he did not know, as he did not know them then;) “and “looked confused and bothered, and went away without “any settlement'. That Hite remarked to Young that he “was particularly anxious to have the plank and lumber “business settled, that he had come expressly for that “purpose.” If Young supposed that business was all finally settled in 1832, why did he not say so to Hite? Why did he go there to settle it, look over the books, take extracts &c. and go off without reminding Hite it was settled, if it had been? If mentioned now, there was a person present, and not only that, it would have led to a refutation by Hite. Fearing the effect of this testimony and John F. Gray’s, Ferguson again takes the deposition of Young, on 6th January, 1839, without notice, upon interrogatories filed; now let us see his version of the meeting with Hite, as related by Wolford. On that day, (6th Jan. ’39,) Young says “he has seen the paper E.; it was shown deponent by Thoms Hite, and he believes it was in May 1836, and in the hand write of John Rice.” Here he paused until 9th January, (see his deposition,) when he again takes up the subject and says, “he did make some statement about account E., but the precise statement he made, he does not noto recollect, but the sub-stane of it was, that he knew nothing of the paper E. except it was in Rice’s hand writing; but where Rice got it from was more than he, deponent, knew; that he had never seen any book or paper in the possession of Ferguson that threw any light upon it,” (he still dont say Ferguson had no books and papers, but the implication is, he had books and papers both, about lumber and plank, &c.) “that he could not find beginning or end of it, and could not make head or tail of it.” The paper is a plain paper, as the Court will see, and has both a beginning and end to it, and it has also a heading and tail too. What could *589 the witness mean, if Ferguson, as he, Ferguson, so often swore, had in truth neither books nor papers relating to the transactions of the lumber business of Graham and Ferguson? Where could he expect to find a beginning or an end, but in the paper itself? Young then proceeds to say he called on Hite for an acknowledgment of the building account, to use it against purchases of lots. If Ormsby and Hite had both acknowledged it in 1832, as he had testified, why an acknowledgment again? He was as competent to prove one acknowledgment as the other. It must be owned that there is something about Young’s and Graham’s depositions about these acknowledgments, that are difficult to reconcile to the other facts in the case, and to those other facts they must yield, There is, as we would respectfully suggest, no satisfaction shown on the part of Hite and Ormsby, after the settlement of the building account, the amount of which they did not controvert. The only difficulty was about the credits. The credit for $342 75, for Ferguson and Graham’s note, including interest, for horses and drays, was offered and accepted, though not within the terms of the payments stipulated to be made, "was, at Ferguson’s request allowed. On the contrary of their being satisfied, we find Hite going 40 miles, to Louisville, several times, to get a settlement up to Spring of 1836. Ormsby had removed to the east before June, 1832, and died in 1833. And Ferguson, instead of seeking an offset to his purchases, if any thing was due, sued Hite; who, thereupon, filed his bill, and would have filed it, if Ferguson had not sued. Whether Ferguson was apprised of the fact, we cannot say; but from Hite’s refusing further payment, unless plank and lumber account was settled, he may have Reasonably inferred what was to follow, if he continued obstinately to decline.
This Court, in their opinion, have stated that, “upon the facts as exhibited, there is, we think, no semblance of plausibility in the pretention that there had never been a full and final settlement of the whole lumber concern.” This sentence of the opinion is strong, we admit, and disheartening, and in the face of which the counsel would have yielded all hope of overcoming, but for their confi *590 dence in the facts clearly established, which they believe, when reviewed by the Court, will lead them to exactly the opposite conclusion. That it is established by evidence, incontestible and uncontroverted, that Hite and Ormsby are entitled to a division of considerable over $20,000, of profits actually made; and if the Court would take the trouble to look into the little pencil memorandum book, filed by Ferguson, they will there find articles of the lumber business, sold at from 50 to 170 per cent on the prime cost of similar articles of lumber charged in the bill of purchases filed, and paid for by ft. Ormsby & Co; and shingles even, will be found to have been sold at 33¼, and they are a very inconsiderable part of the amounts sold or employed in buildings. And from this specimen of the little memorandum book, the 35 per cent allowed by the Chancellor in the decree, is the most favorable assessment against Ferguson that can be made. From this sample, 60 per cent would not exceed the real and actual profit realized.
We believe the evidence fully and indisputably falsifies and discredits Ferguson’s answer; that it fully and satisfactorily establishes that, he had and kept other books than the tittle memorandum books in pencil, and that he has concealed them, or some how else kept them out of the way, for the purpose of relying on the settlement of 1832, to be established by oral testimony, to avoid being compelled to account for the profits; that we have shown beyond doubt, in defiance of his answers, that John Rice was his clerk, so acted, and was notoriously known as such to his customers: indeed, that his answer is so fully disproved in many other points also, not noticed, besides its own evidences of equivocations and untruths, that it can have no sort of credit in the case. That whatever Young or Graham may have stated in their depositions, in regard to acknowledgments and statements, made by Ormsby or Hite, it cannot change the language or force of the paper of 8th July, 1830, into any form or shape, so as to deprive Ormsby and Hite of their just right to a division of the profits of the lumber business, and put them off with the $2076 42, when they have shown themselves entitled to not less than from $15,000 to $16,000., And *591 indeed if we could get at the books, judging from the little one filed, their share of the profits would be nearly double that. Graham has proved Ferguson too ignorant, and at the same time too smart. He may be a worthy man for aught the counsel knows, and intended to go straight, but certain it is there is a palpable leaning to Ferguson, and he undertakes to prove several things he could not personally know, unless he had been all the time with Ferguson, and at his elbow. And as to Young’s deposition, his alliance to Ferguson, his evident interest in his concerns, his confession about exhibit E, will give a clue to the estimation he should have, and the weight to which his evidence is entitled.
As it regards rents, it is to be observed that Hite labored under the belief that the partnership in the lumber business was not dissolved, and expected to settle the rents when the partnership accounts were settled; and if the partnership is held to be dissolved after the purchase of 1826, he is certainly entitled to rents, if not during the partnership, yet from 1827 till 1832; and Ferguson, in his answer, admits rents were payable, but says he paid them at the rate of $350, but to whom, or when, he has neither said nor shown. Daniel Smith proves the rent of square No. 2, was worth from 6 to 800 dollars per year, in those years.
Now, according to all proceedings, when an individual acknowledges he was bound to pay, or it is shown he had the use of another’s property, so valuable, that he is bound to pay for it, and it will not do to say he has paid, unless he proves it; the only settlement in relation to the plank and lumber business, was the partial one of July, ’30; the only other settlement was the building settlement of 1832. Now it is clearly shown, not a cent for rents, except the rent stipulated for, of $800, was settled; his being shown to be bound to pay rent, it devolves on him to show he has paid; he might have tried the effect of the statute of limitations, but this he has not done; and it is respectfully conceived, his answer, alleging he paid, without saying how or when &c., or to whom, cannot avail, especially an answer so totally discredited as Ferguson’s; he can prove any thing it seems, but about *592 these rents, of the payment of them; he has offered no evidence; pointed out no time or place, or to whom paid, so as to afford Hite an opportunity to disprove his assertions.
May, 30.

Fr. Johnson, one of Hite’s counsel.

From these views and considerations of the evidence and facts in the cause, the counsel of the appellee are induced, respectfully to ask the Court for a re-hearing of this cause; All which is respectfully submitted.
The petition was overruled, with the following suggestions, by the Chief Justice:—
We do not concur with the petitioning counsel, as to ail the facts stated in the petition. Nor has he stated all the-facts. Many important, and, as we think, decisive facts, are not even glanced at in the petition.
As no vexed question of law, or important principle, is involved in the case, we did not write an opinion for publication ; nor can we now consent to encumber the Reports with a useless analysis of facts.
We are perfectly satisfied that the partnership was dissolved as early as the spring of the year 1827, and that there was a final settlement, unimpeached for either fraud or mistake, by either allegation or proof. It would, we think, be impossible for argument to change our deductions from the facts in the record.
Wherefore, the petition is overruled.